# Illinois Official Reports

## Appellate Court

---

### *People v. Jones*, 2017 IL App (1st) 143403

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL JONES, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-3403 |
| Filed<br>Rehearing denied | January 30, 2017<br>March 9, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-11594; the Hon. James Michael Obbish, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Peter Sgro, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Sara A. McGann, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Simon and Mikva concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant, Michael Jones, was convicted after a bench trial of aggravated domestic battery, and the trial court sentenced him to five years' imprisonment and four years of mandatory supervised release (MSR). On appeal, defendant contends: (1) the State did not prove him guilty of aggravated domestic battery beyond a reasonable doubt where severe deformities in his hands and arms, along with his lack of strength and range of motion, rendered him incapable of stabbing the victim in her chest; (2) he is entitled to a new trial where the record shows that the trial court prejudged his case and rejected his defense before defendant's expert witness had testified; and (3) he was denied his right to present a full defense when the trial court refused to admit mental health records of the victim. For the following reasons, we affirm.

¶ 2                                    JURISDICTION

¶ 3    Defendant was sentenced on September 29, 2014. He filed a notice of appeal on September 29, 2014. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Dec. 11, 2014), governing appeals from a final judgment of conviction in a criminal case entered below.

¶ 4                                    BACKGROUND

¶ 5    Defendant was charged by information with attempted first degree murder, aggravated domestic battery, unlawful use or possession of a weapon by a felon, and aggravated battery in the stabbing of his ex-girlfriend, Cherelle Richardson. Prior to trial, on the State's motion, Richardson's mental health records were delivered to the trial court for an *in camera* inspection to determine their relevancy before tendering them to the defense. After reviewing the records, the trial court determined that they were not "relevant to any of the current allegations against [defendant]. I don't see how in any way they would be helpful to either party."

¶ 6    Defense counsel filed a motion to reconsider. At the hearing on the motion, counsel argued that the defense at trial would be that Richardson stabbed herself, and her mental health records would "help us determine her mental state and to possibly lead us to any other records" in preparation for confronting Richardson at trial. The trial court noted that the records were from 2009, and detail "an incident that occurred four years prior to the allegations that are before me. And although the complaining witness did in fact receive that mental health treatment for a short period of time, it ended in 2009 with respect to that particular incident. Nothing about that incident seems to me to be in any way relevant to the incident at hand here." The trial court denied the motion but informed defense counsel that if at trial, the mental health records may be necessary for impeachment purposes, "you could renew your motion at that time. And then if it becomes relevant that she had the condition that you describe, that you've learned of and she were to deny that and it was relevant, then the records could be used to impeach her."

¶ 7    At trial, Richardson testified that she met defendant in the spring of 2011. They began an intimate relationship in March 2012, and on November 29, 2012, Richardson gave birth to the couple's son, ZyYon. During this time, Richardson did not have a permanent place of

residence, so she stayed intermittently with defendant at his house at 5345 South Wolcott in Chicago, Illinois. Richardson and defendant frequently argued, which would cause her to leave for a period of time before returning.

¶ 8 On December 11, 2012, they argued and defendant threatened to kill Richardson, placing her in a chokehold from behind as she sat on the couch. During the argument, ZyYon was in a car seat on the floor. Richardson flipped defendant on the floor but he continued to choke her until she "tapped out." The choking incident lasted about two minutes. Richardson left and called the police. Although the officers offered to call an ambulance for her, Richardson declined medical treatment. She filed an order of protection against defendant, but she did not go to court to ensure the order was still in effect because she did not have a way to get there. Subsequent to the incident, Richardson lost custody of ZyYon. When asked on cross-examination the reason Richardson no longer has ZyYon, she answered, "because [defendant] called [the Department of Children and Family Services (DCFS)] on me."

¶ 9 Richardson testified that the couple argued "all the time" from January to May 2013. On May 26, 2013, Richardson went to defendant's house and they argued because defendant's brother had seen Richardson with another man. After they had calmed down from the argument, defendant performed oral sex on Richardson. Richardson, however, refused to reciprocate, which angered defendant. While defendant went into the kitchen, Richardson went into the bathroom. When she walked out of the bathroom, she saw defendant standing by the front door. Richardson went to the front door and as defendant walked past her, he stabbed her in the chest and told her "to go be with that n***a then." She did not realize she had been stabbed until she looked down at her shirt and "seen all the blood coming out." Richardson did not see the object defendant stabbed her with, but his hand touched her "left side, [her] left breast."

¶ 10 Richardson began to panic when she saw the blood. Defendant told her, "B***h, run," and she ran out of the house. Richardson ran down the street trying to find someone to call an ambulance. She eventually passed out and when she awoke, the police asked her if she knew the person who stabbed her before putting her in an ambulance. At the hospital, Richardson underwent emergency surgery to repair the wound.

¶ 11 On cross-examination, Richardson was asked if she had been diagnosed with bipolar disorder. She answered, "Wrong. I don't know how y'all diagnosed me with that because I'm not bipolar and they cannot make no diagnosis off of me." The trial court sustained the State's objection and held a side bar to hear argument on the issue. Defense counsel argued that the defense's theory is that Richardson stabbed herself, and the medical records showing she had been treated for bipolar disorder is relevant to their theory because it would "show her state of mind at the time this stabbing occurred." This exchange followed:

"THE COURT: Do you have any reason to believe by way of evidence that [Richardson] stabbed herself?

MS. PAYETTE [defense attorney]: Other than there's two people in the room and I have strong medical evidence to show that [defendant] is physically incapable of doing it. I think that that would be sufficient, Judge.

THE COURT: So your answer is no, you don't have any evidence that you're going to be putting on?

MS. PAYETTE: Not that I'm going to be putting on, Judge.

- 3 -

THE COURT: Your objection will be sustained."

¶ 12    Richardson acknowledged on cross-examination that she was aware of defendant's physical disabilities, specifically that he had stiff joints and skeletal deformities in his arms and legs. However, Richardson also observed defendant in his daily routine, and he could brush his teeth by himself, and when they cooked together defendant would use a knife to cut the onions, tomatoes, and lettuce. Richardson stated that to brush his teeth, defendant would "bring his head down."

¶ 13    Video taken from a camera next to defendant's house was admitted into evidence. On the video, Richardson is seen holding a jacket and leaving defendant's house after being stabbed. She then turns back toward the house and moments later is seen walking toward the street holding two jackets. A car parked on the street belonged to defendant's cousin. Richardson admitted that she had consumed alcohol and smoked marijuana that day. A few minutes after Richardson left, defendant can be seen leaving his house and entering the front passenger side of his cousin's car. Walking with a limp, defendant is holding a jacket as he gets into the car. Defendant closed the car door by reaching his left arm across his body. No weapon was recovered from defendant's house or in the area outside of his house. The genetic profile of blood taken from the sidewalk outside defendant's house matched Richardson's genetic profile.

¶ 14    Officer Dan Kavalauskas testified that on May 26, 2013,[1] he arrested defendant. After giving defendant his *Miranda* warning, defendant made a statement regarding the incident. Defendant stated that he and Richardson got into a "verbal altercation" at his house. Defendant took Richardson's coat and threw it at her from the porch, telling her to "get the f*** out of there." He then took his book bag and ran to his grandmother's house.

¶ 15    Dr. Ryan Sullivan, the physician who performed emergency surgery on Richardson, testified that the stabbing object created a two-centimeter bleeding laceration on the right ventricle of her heart. The object entered Richardson above her left nipple, pierced her skin, went through subcutaneous fat and breast tissue, through a large muscle of the chest wall, through muscles between the ribs and the inner lining of the chest wall to the membrane surrounding the heart. Dr. Sullivan testified that the object did not pierce through Richardson's heart, although "it was into the heart tissue at some depth." However, if Richardson had not had the emergency surgery, she would have died. Richardson spent five days in the hospital following the emergency surgery.

¶ 16    On cross-examination, Dr. Sullivan stated that the stabbing object entered "at least a good six-inches to get to the heart." When asked whether the wound could have been self-inflicted, Dr. Sullivan answered, "Not being a forensic pathologist, it's not my area of expertise, but I suppose." On redirect examination, Dr. Sullivan stated that the wound could have been inflicted by someone else.

¶ 17    Dr. Tracy Camaj, a physical therapist, testified for the defense. Defense counsel hired Dr. Camaj to examine defendant. Dr. Camaj reviewed the police reports, a preliminary trial report, and a hospitalization report. She examined defendant on April 29, 2013, to assess his range of motion and strength. To measure hand grip strength, Dr. Camaj used a dynamometer. She used a pinch gauge to measure tip-to-tip strength and a gonimoter to measure joint angles. She also

---

[1]Officer Kavalauskas's testimony mistakenly refers to the events as occurring on May 26-27, 2014. There is no dispute that the events actually occurred in 2013.

used a tape measure to measure the girth of defendant's arms and legs. She testified that these instruments are standardized tools used in physical therapy.

¶ 18    After examining defendant, Dr. Camaj concluded that defendant could lift his right arm only 20 degrees and his left arm 35 degrees. However, when Dr. Camaj assisted defendant in lifting his arms she could raise his right arm to 90 degrees and his left arm to 75 degrees. She testified that defendant could resist a couple pounds of pressure on his arms and although he could reach his arms behind his back he could not reach his arms behind his head. Defendant's elbows could only minimally rotate and neither elbow could be fully straightened. Dr. Camaj further noted that defendant's right wrist was bent and she could not move it at all. Defendant's left wrist was also bent, but "he could flex it down to 90 degrees." On defendant's right hand, he had a fairly normal range of motion in his middle and index fingers. The other fingers were held in flex and non-functional and he had minimal movement in his right thumb. On his left hand, defendant could bring his index finger and thumb together. Using the dynamometer, Dr. Camaj measured 20 pounds of grip strength in defendant's right hand, which is nearly 60 pounds lighter than the average person of defendant's age. She could not perform the strength test on defendant's left hand because he could not grip the dynamometer with his left hand. Measuring defendant's ability to grasp and hold objects, Dr. Camaj found that defendant was able to grip about five to six pounds and hold about three or four pounds of pressure with his right hand, while his left hand could grip and hold about two pounds of pressure.

¶ 19    Dr. Camaj stated that it was unlikely that defendant, who was approximately 5 feet 3 inches tall, could raise either arm to Richardson's chest (she was 5 feet 6 inches tall). In her opinion, defendant could not use his left hand to stab Richardson because he did not have the necessary grip strength or elbow range of motion. Dr. Camaj stated that, although defendant could grip an object with his right hand, she did not believe he could lift his right arm high enough to stab Richardson in the chest.

¶ 20    Regarding the prior choking incident, Dr. Camaj stated that defendant "could probably apply pressure with his arm or forearm, but he doesn't have that ability to choke someone as we typically would see with a bent elbow." When asked whether she believed, within a reasonable degree of medical certainty, that defendant could have stabbed Richardson, Dr. Camaj responded, "I don't believe he could have stabbed her from a standing position and thrust a knife into her chest, I don't."

¶ 21    On cross-examination, Dr. Camaj acknowledged that she did not review any of defendant's previous medical records and did not ask defendant about his daily activities. She was unaware whether defendant could cut vegetables, use a key to open a door, or smoke. Dr. Camaj also acknowledged that while defendant could not physically hold a dynamometer, which is a tool much larger than a knife or pen, it did not indicate that defendant could not hold any object. Although there was a discrepancy between the angles defendant could lift his arms by himself, and the angles Dr. Camaj could lift defendant's arms, Dr. Camaj did not believe defendant was malingering. Instead, she described defendant as "not giving full effort." Dr. Camaj stated that based on her evaluation, "it would be pretty impossible" for defendant to hold an instrument and lift his hand to stab Richardson. When the State asked her, "But not impossible, isn't that true, [Dr. Camaj]?" she answered, "Correct." She further stated that she did not evaluate defendant for the possibility of using momentum with his grip strength because "[t]here is typically no way to really evaluate momentum, no standard to do that."

¶ 22    The trial court granted defendant's motion for a directed finding of not guilty on the aggravated unlawful use or possession of a weapon by a felon charge because no weapon was recovered, and also found defendant not guilty of attempted first degree murder. However, the trial court found defendant guilty of count II, aggravated domestic battery, and the aggravated battery charge was merged into count II. The court reasoned:

> "But the expert witness said that ultimately when one listens and evaluates her testimony that what occurred here, what is alleged that [defendant] did would be difficult but not impossible.
>
> And in just looking myself at the exhibits here, People's Exhibits 3 and 4 which are the exhibits which show the point of entry in the complaining witness' left breast area, it shows that although whatever entered her breast at that point, as we know from the doctor's testimony I believe, may have gone almost six inches in depth, *** you could see from the photograph itself the point of entry is extraordinarily small. So whatever object entered into her breast at that point and proceeded further in, I don't believe would have needed the strength and velocity of a fully developed adult male who would not have any physical deformities or any of the conditions that [defendant] is afflicted with.
>
> There has been no proof adduced by anybody, I don't know it could be, as to what kind of force would be necessary. This is a perhaps slender, sharp object that is going through soft tissue, skin. It's not penetrating bones.
>
> * * *
>
> So I don't think it's necessary that [defendant] be someone of some superior strength or normal strength in order to accomplish what I believe he did do."

The trial court found Dr. Camaj's testimony "interesting and credible" but it did not relate "to the actual events." Rather, the court found significant the video that showed defendant getting into a car and reaching his left arm across his body to close the car door. The trial court described the act as "requiring more, it would seem to me, more physical exertion and [strength] and flexibility on his part than just sort of uncoiling his body and being able to thrust, you know, some type of knife or ice pick or some type of sharp object that would pass through skin and tissue rather easily."

¶ 23    Furthermore, the trial court found Richardson's testimony credible and defendant's theory that Richardson stabbed herself in the heart "defi[ed] common sense" because if she merely wanted to frame defendant as revenge for reporting her to DCFS, she would not give herself a near fatal injury. The court also noted that no eyewitnesses could corroborate defendant's contention that Richardson stabbed herself, and the evidence instead corroborated Richardson's testimony.

¶ 24    At sentencing, after considering evidence in mitigation and aggravation, the trial court sentenced defendant to five years' imprisonment. Defendant filed this timely appeal.

¶ 25                                ANALYSIS

¶ 26    On appeal, defendant first contends that the State failed to prove him guilty of aggravated domestic battery beyond a reasonable doubt. When defendant challenges the sufficiency of the evidence, this court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). It is not the function of this court to retry defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, it is the role of the factfinder to weigh the evidence in making a determination. *People v. Tye*, 141 Ill. 2d 1, 13 (1990). "It is not necessary that the trier of fact find beyond a reasonable doubt as to each link on the chain of circumstances. Rather, the trier of fact must find only that the evidence taken together supports a finding of the defendant's guilt beyond a reasonable doubt." *Evans*, 209 Ill. 2d at 209. Furthermore, the factfinder is not obligated "to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt." *People v. Herrett*, 137 Ill. 2d 195, 206 (1990). A reviewing court will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of defendant's guilt. *Id.*

¶ 27    Defendant argues that his conviction of aggravated domestic battery is unreasonable where the unrebutted expert testimony of Dr. Camaj found that defendant's "severe deformities in his arms and hands rendered him incapable of stabbing" Richardson. The weight assigned to an expert's testimony depends upon the facts supporting the expert's opinion and the reasons given for the opinion. *Doser v. Savage Manufacturing & Sales, Inc.*, 142 Ill. 2d 176, 195 (1990). The trial court may accept or reject expert testimony in whole or in part and need not accept the opinion of one expert even where that expert's testimony is not contradicted by the testimony of another expert. *People v. Tara*, 367 Ill. App. 3d 479, 489 (2006).

¶ 28    After performing various motion and strength tests on defendant, Dr. Camaj concluded that it was unlikely that defendant could use his left hand to stab Richardson because he did not have the necessary grip strength or elbow range of motion. Although defendant could grip an object with his right hand, she did not believe he could lift his right arm high enough to stab Richardson in the chest. However, Dr. Camaj acknowledged that during the examination, defendant was "not giving full effort." She also conceded that while defendant's left hand could not physically hold a dynamometer, which is a tool much larger than a knife or pen, it did not mean defendant could not hold any object. The trial court concluded that although Dr. Camaj's testimony was "interesting and credible," it did not relate "to the actual events."

¶ 29    The trial court noted that Richardson's wound was evidenced by an "extraordinarily small" entry point. Although defendant could not fully grip the instruments Dr. Camaj used in her examination, those instruments were much larger than a knife or other sharp, narrow object that was probably used to stab Richardson. Other evidence showed that defendant was able to grip and use narrow, relatively light objects. Richardson testified that defendant used a knife to cut onions, and that he could brush his teeth by himself. The trial court further found that defendant's actions of getting into a car and reaching his left arm across his body to close the car door showed he had the physical exertion strength and flexibility "to thrust, you know, some type of knife or ice pick or some type of sharp object that would pass through skin and tissue rather easily."

¶ 30    The trial court also found that, contrary to defendant's contention, Dr. Camaj did not conclude defendant was incapable of stabbing Richardson. When asked whether she believed, within a reasonable degree of medical certainty, that defendant could have stabbed Richardson, Dr. Camaj responded, "I don't believe he could have stabbed her from a standing position and thrust a knife into her chest, I don't." Dr. Camaj stated that based on her evaluation, "it would be pretty impossible" for defendant to hold an instrument and lift his

hand to stab Richardson. When the State asked her, "But not impossible, isn't that true, [Dr. Camaj]?" she answered, "Correct."

¶ 31    Furthermore, the trial court deemed Richardson's testimony credible over defendant's theory that she stabbed herself, finding the notion Richardson would give herself a near fatal injury to get back at defendant "defi[es] common sense," and pointing out that no weapon was found on or near Richardson after she collapsed. The trier of fact assesses the credibility of witnesses and resolves conflicts or inconsistencies in the evidence. *Evans*, 209 Ill. 2d at 211. We find that the evidence presented supports the trial court's determination that defendant stabbed Richardson.

¶ 32    Next, defendant contends that he was denied his right to a fair trial where the trial court was biased and rejected the defense's theory of the case before Dr. Camaj, defendant's main witness, testified. Defendant has a constitutional right to an unbiased, open-minded trier of fact. *People v. Phuong*, 287 Ill. App. 3d 988, 993 (1997). The constitutional guaranty of due process "entitles a defendant to a fair and impartial trial before a court which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial." *People v. Eckert*, 194 Ill. App. 3d 667, 673 (1990). Defendant acknowledges that he did not raise this issue below, but argues that we should consider the issue as plain error. Judicial bias "is one of the few trial errors that may not be deemed harmless; moreover, the waiver rule is applied less rigidly where the conduct of the trial judge is the basis for the appeal." *People v. Williams*, 272 Ill. App. 3d 868, 874 (1995). However, in reviewing a plain error contention, this court must first determine whether any error occurred at all. *People v. Bannister*, 232 Ill. 2d 52, 65 (2008).

¶ 33    Defendant argues that the trial court improperly rejected the defense's theory of the case before his witness, Dr. Camaj, testified. He first points to the exchange between the trial court and defense counsel regarding the use of medical records to indicate Richardson's alleged past bipolar diagnosis. Defense counsel argued that the records were necessary to support the theory that Richardson stabbed herself and would go to her state of mind at the time of the stabbing. The trial court asked if counsel had any evidence to show that Richardson stabbed herself. Defense counsel answered that there were two people in the room when the stabbing occurred, and she had "strong medical evidence to show that [defendant] is physically incapable of doing it. I think that that would be sufficient." The trial court responded, "So your answer is no, you don't have any evidence that you're going to be putting on?" Defense counsel answered, "Not that I'm going to be putting on, Judge."

¶ 34    Defendant contends that the trial court's comments indicate that the court improperly rejected his defense before Dr. Camaj could testify. We disagree. At the sidebar where this exchange occurred, the trial court was determining the relevancy of Richardson's mental health records regarding an incident that occurred more than four years prior to defendant's case. Defense counsel argued for admission and use of the records while Richardson testified, because they would support his theory that Richardson stabbed herself. To make its relevancy determination, the trial court merely asked whether counsel had evidence that she would be presenting that Richardson stabbed herself. Dr. Camaj's testimony was not evidence that Richardson stabbed herself; rather, it was evidence that defendant was incapable of stabbing Richardson. The trial court merely stated as much, and defense counsel concurred. The trial court then sustained the State's objection. We find nothing in that exchange indicating the trial court was biased against defendant and rejected his theory of the case prior to Dr. Camaj's testimony.

¶ 35    The cases cited by defendant as support—*People v. Ojeda*, 110 Ill. App. 2d 480 (1969), *People v. McDaniels*, 144 Ill. App. 3d 459 (1986), *People v. Johnson*, 4 Ill. App. 3d 539 (1972), and *People v. Heiman*, 286 Ill. App. 3d 102 (1996)—are distinguishable in that the trial court in those cases clearly indicated it did not find the defendant's case credible prior to the presentation of defendant's evidence. Here, after presentation of all the evidence, the trial court concluded that Dr. Camaj was a credible witness but found that her examination of defendant did not preclude the possibility that he stabbed Richardson and that Dr. Camaj herself acknowledged that, although she believed it would be difficult for defendant to stab Richardson, it was not impossible. Unlike the judges in *Ojeda*, *McDaniels*, *Johnson*, and *Heiman*, the trial court here properly considered evidence presented by defendant in support of his defense before making its determination.

¶ 36    Defendant also argues that the trial court improperly based its determination on knowledge it had about outside cases rather than on the evidence presented. The trial court here, as the trier of fact, is presumed to know the law and to have considered only competent evidence in making a determination on the merits. *People v. Koch*, 248 Ill. App. 3d 584, 592 (1993). To rebut this presumption, the record must affirmatively show that the trial court actually used the evidence improperly as alleged. *Id.*

¶ 37    In announcing the verdict, the trial court commented that in 40 years it had not had a case where "a person has stabbed themselves and then immediately runs out of the house and immediately when interviewed" by police told them someone else stabbed her. At the hearing on defendant's motion to reconsider, the trial court commented that it did not believe Richardson had the intelligence to frame defendant. Defendant argues that these statements show the trial court improperly considered evidence not in the record and, therefore, the presumption that it considered only competent evidence was rebutted. As support, defendant cites *People v. Wallenberg*, 24 Ill. 2d 350 (1962). In *Wallenberg*, a witness testified that his truck had a soft tire, and he travelled down a stretch of streets where he found no gas stations. In pronouncing its judgment, the trial court remarked that, although the witness stated that he found no gas stations along that stretch, " 'I happen to know different. I don't believe his story.' " *Id.* at 354. However, no evidence contradicting the witness's testimony was in the record. *Id.* The supreme court found that the trial court improperly made a determination based upon its private knowledge instead of on the record before it, and therefore the presumption that the trial court considered only admissible evidence was rebutted. *Id.*

¶ 38    Unlike the trial court in *Wallenberg*, the trial court here did not make determinations that contradicted undisputed testimony in the record. Rather, the trial court was merely making a determination on the credibility of defendant and Richardson based on past knowledge and experience. The court had to decide between competing versions of how Richardson was stabbed. Triers of fact are entitled to use their knowledge and observations in life when considering the evidence presented. *People v. Hobley*, 182 Ill. 2d 404, 465 (1998). We find that the trial court committed no error in making these statements.

¶ 39    Defendant's final contention is that his constitutional right to confront witnesses was violated when the trial court denied his request to admit Richardson's mental health records. As a result, he was precluded from "probing Richardson's history of mental illness during cross-examination." These mental health records, however, are not part of the record on appeal. The trial court viewed the records *in camera* on the State's motion. Illinois Supreme Court Rule 415(f) (eff. Oct. 1, 1971) states that "If the court enters an order granting relief

following a showing *in camera*, the entire record of such showing shall be sealed, impounded, and preserved in the records of the court, to be made available to the reviewing court in the event of an appeal." It is the defendant's burden, as the complaining party, to request that the records involved are sealed, impounded, and preserved for appeal. *People v. Deleon*, 227 Ill. 2d 322, 342 (2008). "[A]bsent a request for such compliance, any deficiency in the record will be attributable to that party." *Id.* As our supreme court reasoned in *Deleon*, "it is *the appellant's* burden to present a sufficiently complete record of the proceedings below to support a claim of error and, in the absence of a complete record on appeal, it will be presumed that the order entered by the circuit court was in conformity with the law and had a sufficient factual basis." (Emphasis in original.) *Id.*

¶ 40    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 41    Affirmed.