2025 IL App (1st) 232499-U

FIFTH DIVISION
November 21, 2025

No. 1-23-2499

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 CR 1295001 |
| | ) | |
| KOREY GILES, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Justice Tailor concurred in the judgment.
Justice Oden Johnson specially concurred.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for domestic battery and reject his arguments that the State failed to prove his guilt beyond a reasonable doubt, that the trial court allowed improper evidence impeaching his witnesses, and that the trial court was biased and prejudged him guilty before trial concluded.

¶ 2    After a bench trial, defendant Korey Giles was convicted of misdemeanor domestic battery for making contact of an insulting or provoking nature with the mother of his child and sentenced to 180 days in jail. Mr. Giles, the victim, and all of the witnesses are current or former Chicago police officers. On appeal, Mr. Giles argues that the State failed to prove his guilt beyond a

reasonable doubt, the trial court erred in admitting improper evidence impeaching his witnesses, and the trial court violated his right to a fair trial by prejudging his guilt before trial concluded. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4                                A. Bond Hearing

¶ 5     After his arrest, Mr. Giles was released on bond with GPS monitoring. He then filed a motion to amend the conditions of his bond to remove the monitoring. Some of the court's statements at a hearing on that motion are one basis for Mr. Giles's argument that the trial court was prejudiced against him.

¶ 6     At the hearing, defense counsel explained that the GPS monitoring band left Mr. Giles "unfit for duty" as a Chicago police officer. Mr. Giles was also subject to an emergency order of protection against the alleged victim. However, if the GPS monitor and the order of protection were removed, he could be placed on "non-policing status," and receive pay and benefits without being a sworn officer or carrying a gun. The court responded: "So there is no consequence whatsoever by being on bond and GPS taken off. Do whatever he wants to do, go back to work. Can't carry a gun or anything, go back to work, get paid?" Defense counsel answered that was true, and the court asked "So why should I do that? Another judge put the GPS on him."

¶ 7     The court also asked whether, if Mr. Giles returned to work, he would encounter the alleged victim. Defense counsel responded that he would not because the alleged victim worked in a different district. The State objected to the removal of the GPS monitor. The court asked again whether Mr. Giles was currently being paid, and defense counsel responded that he was not, as he was considered unfit for duty. The court asked, "If he is, it's by his own choosing, right?"

¶ 8     Later in the hearing, the court asked Mr. Giles, "What are you doing these days now?" Mr.

Giles answered that he had been at home with his baby daughter, who was not his child with the alleged victim. The court remarked that it was reminded of Shawn Kemp, a former basketball player, who the court stated "had 11 children, Shawn Kemp by 11 different women. He want[ed] to be the father of this country like George Washington, 11 children with 11 different women." Upon learning that Mr. Giles had been seeing the alleged victim and the mother of his other child simultaneously, the court remarked, "The poor man, Shawn Kemp." The court also asked the State, which had charged Mr. Giles with aggravated domestic battery, what class of felony that charge would be "if established, I am not saying it will be or won't be." The court ultimately granted Mr. Giles's request to remove the GPS monitoring but increased his bail from $5000 to $10,000 "to ensure his presence under the circumstances."

¶ 9                                          B. Trial

¶ 10    Mr. Giles was charged with one count of aggravated domestic battery for strangling Ms. Khalilah Muhammad, who was the mother of his child (count I), and one count of domestic battery for making contact of an insulting or provoking nature with her by striking her about the face (count II).

¶ 11    In opening statements, the State explained that the evidence would show that Mr. Giles entered Ms. Muhammad's house, heard her speaking on the phone with male coworkers, and grew jealous, prompting several physical confrontations over the course of one night in which Mr. Giles struck and choked Ms. Muhammad. Defense counsel's alternative statement of the evidence was that Mr. Giles confronted Ms. Muhammad because, when he came into the house, he heard her giving away his personal information over the phone, and that he did not commit any battery.

¶ 12                                  1. *The State's Case-in-Chief*

¶ 13    Ms. Muhammad testified that she met Mr. Giles at the police academy four-and-a-half

3

years before trial. In September and October 2022, they were in an on-and-off, non-exclusive relationship and occasionally slept together. Their son, Korey Giles Jr., nicknamed "Bam," was two years old on October 15, 2022. Ms. Muhammad and Bam lived in Mr. Giles's childhood home, which Mr. Giles had sold to Ms. Muhammad.

¶ 14   On October 15, 2022, Ms. Muhammad was scheduled to work a shift as a police officer at 11 p.m., but took the night off because Bam was not feeling well. She had purchased pants, a card, and a bottle of tequila that she planned to give Mr. Giles that night for a holiday called Sweetest Day. She cooked dinner but testified she planned for Mr. Giles to eat it when he came over to watch Bam that night and had not prepared for an intimate dinner with him. Mr. Giles, who had a key to the house, came over around 10 or 11 p.m., while Ms. Muhammad was upstairs in her bedroom with Bam and talking to two male coworkers on speakerphone. She had drunk one glass of wine.

¶ 15   Ms. Muhammad hung up the phone and saw Mr. Giles. Mr. Giles said, "you f***ed up," and asked what she had been talking about with her coworkers. Ms. Muhammad responded that her coworkers were just asking why she was not at work. Mr. Giles then dragged her off the bed by her leg and grabbed her phone. He ran downstairs and locked himself in a guest room. She asked him to exit and he did not, so she kicked the door in and demanded her phone and that he leave. Three or four times, Ms. Muhammad reached for her phone while Mr. Giles held it up in one hand. Each time, he punched her in the face with his other hand, knocking her down. Ms. Muhammad eventually retrieved her phone, and Mr. Giles left. The State entered into evidence photographs of the door to the guest room, which are included in the record on appeal and show damage several inches below the doorknob. Ms. Muhammad testified the damage is where she kicked the door in.

4

¶ 16   On direct examination, Ms. Muhammad testified that she believed Mr. Giles struck her on the right side of her face. On cross-examination, however, she testified that Mr. Giles punched her in the jaw but she did not remember whether it was on her right or left side. Also on cross-examination, Ms. Muhammad testified that she "[m]aybe" mentioned to the men who were on the phone when Mr. Giles arrived that Mr. Giles owned an apartment building on Ashland Avenue and lived with his mother in Beverly.

¶ 17   After Mr. Giles left, Ms. Muhammad called his mother, calmed down, and went upstairs to check on Bam. Mr. Giles returned a few minutes later and came upstairs. She told him to leave and they "tussle[d]" near the staircase. He left again, taking the tequila she had bought him.

¶ 18   Thirty or forty minutes later, Mr. Giles returned again. He "seemed intoxicated and more aggressively angry." He came straight to the upstairs bedroom, where Ms. Muhammad remained. He called her a "dumb b***" and a "whore," said he hated her and wished they did not have a child together, and she "f***ed up" by talking to her coworkers. Mr. Giles's sister, Kayla Giles, and Ms. Giles's roommate Jalynn Hooks also arrived. Ms. Giles and Ms. Hooks tried to get Mr. Giles to leave Ms. Muhammad's bedroom. All four adults approached the stairs as Mr. Giles and Ms. Muhammad continued to argue. Ms. Giles and Ms. Hooks then began searching the bedrooms for Mr. Giles's phone. At the top of the staircase, Mr. Giles began choking Ms. Muhammad with two hands. Ms. Muhammad fell and he choked her for about 10 seconds while Ms. Giles and Ms. Hooks yelled at him to stop.

¶ 19   Mr. Giles released Ms. Muhammad, got up, and went outside, followed by Ms. Hooks. Ms. Giles remained to look for Mr. Giles's phone. Ms. Muhammad said she was going to call the police, and Ms. Giles went to speak with Mr. Giles. Mr. Giles then re-entered the house "yelling and screaming," and tried to strike Ms. Muhammad. Mr. Giles's best friend, and Bam's godfather,

Bruce Burns, had also arrived and "physically remove[d]" Mr. Giles from the house. Everyone else left, and Ms. Muhammad called the police.

¶ 20     When police officers arrived, Ms. Muhammad declined medical attention, but she went to the hospital the following morning. An evidence technician photographed her on October 16, 2022, and the photographs were entered into evidence and are included in the record on appeal. Several close shots of Ms. Muhammad's face and neck depict multiple scratches on the left side of her neck and collar area, some with scabs or dried blood, and a red stain on the left shoulder strap of her shirt. She testified those injuries were caused by her "moving around" and "moving [her] neck" as Mr. Giles choked her. Other photographs show scratches on the outside of her upper right arm and her lower back.

¶ 21     Defense counsel attempted to impeach Ms. Muhammad with statements that she made following the events of that night. Ms. Muhammad testified that she did not recall speaking with a sergeant the night of the incident and failing to tell him that Mr. Giles punched her or that she kicked down a door. She "believe[d]" she told officers that night that Mr. Giles had punched her three times. Counsel played an audio recording which Ms. Muhammad testified included her saying that, when Mr. Giles first arrived, she came downstairs, encountered him in the kitchen, then returned upstairs where Mr. Giles pulled her off the bed, rather than first encountering him in her upstairs bedroom as she had testified. She testified that her statement in the recording was the truth of what happened. Defense counsel also played a video recording that she testified depicted her making a choking gesture with one hand. Ms. Muhammad testified that she did not remember whether Mr. Giles choked her with one hand or two. These recordings are not included in the record on appeal.

¶ 22     Further, on October 18, 2022, Ms. Muhammad gave a statement to the Civilian Office of

Police Accountability (COPA). She stated then that, when Mr. Giles first returned to her house and they "tussle[d]" near the stairs, he punched, slapped, and scratched her, which she testified resulted in the scratches to her arms. When asked by the COPA investigator if she planned to get an X-ray, she answered, "No, but, like I said, I can go to the doctor if you feel like that would help in this case any way."

¶ 23                    2. *The Defense's Case and the State's Rebuttal Case*

¶ 24    The defense called Mr. Giles, Ms. Giles, Ms. Hooks, and Mr. Burns, all of whom were police officers on October 15, 2022, and testified consistently with each other about the events of that night.

¶ 25    Mr. Giles testified that, when he first entered Ms. Muhammad's home on October 15, 2022, the dining room table bore the gifts Ms. Muhammad had bought him, dinner plates, candles, and a card with his name. He heard Ms. Muhammad on speakerphone upstairs and the shower running. A man on the phone said, "he got real estate. He stays in Beverly, he has a building on Ashland." This concerned Mr. Giles because no one knew he owned a building on Ashland, he did not know how the man knew where he lived, and two men had attempted to carjack Ms. Muhammad in front of her house two weeks prior.

¶ 26    Ms. Muhammad then came downstairs wearing only a towel. She saw Mr. Giles and hung up the phone. He asked how the person on the phone knew his information, and to see her phone. She gave him her phone and he saw a text message that included his garage code and pictures of Bam. He asked about that message and Ms. Muhammad started to strike and attack him, trying to grab her phone back. Mr. Giles ran into the guest room and locked the door to look closer at her text messages, but the phone had locked and he could not access it. Ms. Muhammad kicked the door open and Mr. Giles returned her phone and went upstairs to get Bam. He did not strike her.

Ms. Muhammad came upstairs and begin hitting Mr. Giles to prevent him from taking Bam. Mr. Giles called his sister, Ms. Kayla Giles, who told him to come to her house. He put Bam down, took the clothes, card, and tequila, and drove to Ms. Giles's house, which was about five minutes from Ms. Muhammad's.

¶ 27    At Ms. Giles's house, Mr. Giles told her of the conversation he had overheard and the messages he had seen. Ms. Giles initially recommended calling the police, but she and Mr. Giles then determined that Ms. Muhammad may have calmed down and Mr. Giles should return and speak with her. He also was concerned that Ms. Muhammad's carjacking and her giving his information to someone else were connected and wanted to know more. Ms. Giles told him to call her again if anything went wrong.

¶ 28    When Mr. Giles returned to Ms. Muhammad's, he went upstairs and saw her lying in bed with Bam. Mr. Giles asked who knew his address, and Ms. Muhammad told him to leave, noted he had another baby coming, and accused him of thinking she was a bad mother and of being involved with other women. He knew she had been drinking because he saw a bottle of wine and glass, and he could smell it on her. Ms. Muhammad rose from the bed and pushed Mr. Giles while "yelling about another woman." Mr. Giles called his sister, asked her to come to Ms. Muhammad's, and went downstairs.

¶ 29    Mr. Giles let Ms. Giles and Ms. Hooks into Ms. Muhammad's when they arrived. Ms. Muhammad was yelling, was "obviously drunk," and had no visible injuries. Ms. Hooks testified that Ms. Muhammad was upstairs when they arrived; Ms. Giles testified that Ms. Muhammad was on the first floor and she escorted Ms. Muhammad upstairs. Ms. Giles tried to calm Ms. Muhammad and persuade her to allow Mr. Giles take Bam for the night. Mr. Giles and Ms. Hooks walked outside.

¶ 30    Mr. Giles noticed he did not have his phone and reentered the house. He went upstairs and did not see his phone but decided to leave with Bam, as he felt Ms. Muhammad was drunk and they were "getting nowhere." He picked Bam up while Ms. Muhammad continued yelling. Everyone began descending the stairs, with Ms. Hooks at the bottom, then Mr. Giles holding Bam, Ms. Giles, and Ms. Muhammad. Ms. Muhammad was yelling and started to "push and shove," and "charg[e]" at Mr. Giles to take Bam from him. Ms. Giles pushed her back so they did not all fall down the stairs, scratching Ms. Muhammad with her long fingernails, which she showed to the court. Ms. Muhammad fell. Mr. Giles put Bam down and exited the house with Ms. Hooks. Bam returned to a bedroom. Ms. Giles remained upstairs talking to Ms. Muhammad.

¶ 31    Mr. Giles and Ms. Hooks were sitting in a car outside when Mr. Burns arrived. Ms. Giles had called him earlier. Mr. Giles, Mr. Burns, and Ms. Hooks reentered the house to retrieve Mr. Giles's phone. Mr. Burns denied trying to hold Mr. Giles back from reentering. Ms. Giles testified she was on the first floor when Mr. Giles entered. Ms. Muhammad said she was calling the police. Mr. Giles never strangled, punched, scratched, or did "anything" to Ms. Muhammad, and Mr. Burns never had to restrain him. The "[o]nly thing" Mr. Giles did, according to him, was tell her "scoot back," as she tried to hit him. Ms. Giles, Ms. Hooks, and Mr. Burns denied seeing Mr. Giles strangle Ms. Muhammad, or witnessing any physical confrontation between them, and Mr. Burns denied ever having to pull him off Ms. Muhammad.

¶ 32    During cross-examination, Mr. Burns identified himself and Mr. Giles as individuals depicted in a doorbell camera video. The prosecutor asked if it showed him reaching towards Mr. Giles, and Mr. Burns agreed that it did but stated that he was "[n]ot necessarily" trying to hold Mr. Giles back. The video is included in the record on appeal, and it depicts a man appearing to enter a house while another man grabs the first man's shirt near his waist. The second man and two

9

women then follow the first man into the house.

¶ 33 During her cross-examination, Ms. Hooks testified that she was asked to give a statement to COPA two days later and declined. The State did not ask Ms. Giles or Mr. Burns whether they gave statements to COPA. However, in rebuttal, the State called Chicago police sergeant Emmet Welch, who testified he investigated Mr. Giles for the Bureau of Internal Affairs. On October 18, 2022, Sergeant Welch offered Ms. Giles, Mr. Burns, and Ms. Hooks the opportunity to give a statement to COPA, and none did.

¶ 34                    3. *Closing Argument, the Court's Findings, and Sentencing*

¶ 35 In its closing argument, the State asserted that Ms. Muhammad was the only credible witness and that the photographs, which showed scratches on her body and "a little bit of swelling" on her face, contradicted the defense's witnesses that only Ms. Giles pushed her once.

¶ 36 During defense counsel's closing argument, the court interrupted several times to ask questions about the evidence or comment on counsel's interpretation of the evidence. For example, counsel argued that the photographs did not show Ms. Muhammad was strangled or suffered injuries to her face. The court asked, "What about beneath the left eye?" and counsel responded that it looked "exactly the same as the right eye." Counsel stated that it was not known how many glasses of wine Ms. Muhammad drank, and the court commented that, "She said one." When counsel commented that Ms. Muhammad did not call the police when Mr. Giles first left her house, the court said, "She's already the police."

¶ 37 Defense counsel additionally suggested that Ms. Muhammad could have been injured busting down the guest room door, and the court noted she had testified she did so with her foot. Counsel argued that Mr. Giles testified he pushed Ms. Muhammad when she attacked him to get her phone back; the court commented that Mr. Giles testified he never made contact with her,

besides "the little shoving," which counsel claimed did not cause Ms. Muhammad's scratches. The court responded Ms. Giles "might" or "must" have caused the scratches then, with her "[v]ery attractive nails." After stating again that there was no evidence Ms. Muhammad was strangled, counsel concluded, "I don't want to repeat myself, it's getting late. *** End result, Judge, I just don't think the State met its burden of proof."

¶ 38   In rebuttal argument, the State noted it was "hard to impeach" the defense witnesses "when they refuse to give a statement to police, [w]hen they refuse to provide their side of the story."

¶ 39   Following argument, the court stated that, before it made its decision, it wanted to note that "Police are people, too. Just because they're cops, and they want—not to say something—anything at all. Happen to be police, happen to be police. That's all." The court then found there was "some impeachment" of Ms. Muhammad's testimony, including by noting she had cooked dinner for Mr. Giles, but that Mr. Giles's "version of events is absolutely ridiculous, to tell you the truth." The court stated the photographs showed scratches on various parts of Ms. Muhammad's body, and her left eye looked "a little bit different than the other one, maybe not about that." The court found Mr. Giles not guilty of count I, aggravated domestic battery predicated on strangling Ms. Muhammad, but guilty of count II, domestic battery predicated on making contact of an insulting or provoking nature with Ms. Muhammad. After a hearing, the court sentenced Mr. Giles to 180 days in jail. This appeal followed.

¶ 40                                    II. JURISDICTION

¶ 41   The court sentenced Mr. Giles on November 14, 2023, and he filed a timely notice of appeal on December 13, 2023. We therefore have jurisdiction pursuant to Illinois Supreme Court Rule 606 (eff. Oct. 19, 2023), which governs appeals from final judgments in criminal cases.

¶ 42                                    III. ANALYSIS

¶ 43    On appeal, Mr. Giles argues that (1) the State failed to prove him guilty of domestic battery beyond a reasonable doubt, (2) the trial court committed plain error by allowing the State to introduce Sergeant Welch's testimony that Ms. Giles, Ms. Hooks, and Mr. Burns each declined to give a statement to COPA, and (3) the court violated his right to a fair trial by prejudging his guilt before the end of trial. We address each of these arguments in turn.

¶ 44                            A. Sufficiency of the Evidence

¶ 45    When a defendant challenges the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Bush*, 2023 IL 128747, ¶ 33. It is the factfinder's responsibility to weigh the evidence, resolve conflicts in testimony, and draw reasonable inferences from the facts. *People v. Gray*, 2017 IL 120958, ¶ 35. Therefore, we will not substitute our judgment for the factfinder's on questions involving the weight of the evidence or the credibility of witnesses; nor will we retry a defendant. *People v. Jones*, 2023 IL 127810, ¶ 28. "We will set aside a conviction only where the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Bush*, 2023 IL 128747, ¶ 33.

¶ 46    Mr. Giles was convicted of violating section 12-3.2(a)(2) of the Criminal Code of 2012, which provides that a person commits domestic battery if he knowingly, "by any means," makes "physical contact of an insulting or provoking nature with any family or household member." 720 ILCS 5/12-3.2(a)(2) (West 2022). Physical contact is insulting or provoking if "a reasonable person under the circumstances" would find it so. *People v. Davidson*, 2023 IL 127538, ¶ 16.

¶ 47    Initially, we note that, in challenging his conviction, Mr. Giles asserts that the State was

required to prove that he struck Ms. Muhammad in the face. He bases this on the fact that he was found guilty of count II of the indictment, which alleged that his striking Ms. Muhammad about the face was the manner in which he made physical contact of an insulting or provoking nature with her. He argues that the State failed to prove he struck her in the face where Ms. Muhammad testified she did not know how many times or on what side of her face he struck her, she did not tell officers on the night of the event that he punched her, and the photographs did not depict any injury to her jaw like she described.

¶ 48      However, this allegation was not an essential element of the offense of domestic battery. See 720 ILCS 5/12-3.2(a)(2) (West 2022) (domestic battery includes making insulting or provoking physical contact "by any means"). This allegation merely concerned the means or manner by which he was alleged to have made insulting or provoking contact. See *People v. Nathan*, 282 Ill. App. 3d 608, 611 (1996) ("The particular details of the means defendant allegedly used do not constitute essential elements of the offense of aggravated battery.") The State did not need to prove that Mr. Giles struck Ms. Muhammad in the face to prove him guilty of domestic battery.

¶ 49      Mr. Giles's primary argument is that Ms. Muhammad's testimony was not credible. He notes that he, Ms. Giles, Ms. Hooks, and Mr. Burns all contradicted Ms. Muhammad's testimony about his conduct. He emphasizes that Ms. Muhammad appeared uninjured when Ms. Giles arrived at Ms. Muhammad's house and Ms. Giles testified that she was the one who scratched Ms. Muhammad with her fingernails when she pushed her. Mr. Giles acknowledges that Ms. Muhammad testified that Mr. Giles made contact with her before the other witnesses arrived, but argues that the defense witnesses' contradictory testimony about what happened after they arrived casts doubt on Ms. Muhammad's testimony about the earlier events.

¶ 50    Mr. Giles also argues that, by acquitting Mr. Giles of strangling Ms. Muhammad, and in noting that it did not believe her testimony that she had not cooked dinner to celebrate Sweetest Day with Mr. Giles, the court recognized that Ms. Muhammad was not credible. Mr. Giles argues these unbelievable parts of her testimony discredit her whole testimony. See *People v. Cunningham*, 212 Ill. 2d 274, 285 (2004) ("specific flaws" in testimony may create doubts about the whole testimony).

¶ 51    These arguments are a request that we substitute our judgment for the trial court's on a question of witness credibility, which we generally may not do. *Jones*, 2023 IL 127810, ¶ 28. The trial court did not believe that any flaws in Ms. Muhammad's testimony rendered the rest of her testimony incredible, and the record does not compel such a conclusion. Also, the physical evidence contradicted some statements from defendant's witnesses, such as Ms. Giles's testimony that she scratched Ms. Muhammad once and that Ms. Giles was inside the house when Mr. Giles, Mr. Burns, and Ms. Hooks entered it the final time. The photographs show scratches on Ms. Muhammad's neck, arm, and back, and the doorbell camera video depicting Mr. Burns and Mr. Giles entering clearly shows two men and then two women entering the house. The video therefore comports with Ms. Muhammad's testimony that, after she said she was going to call the police, Ms. Giles went to speak with Mr. Giles, who was outside, before he entered the house the final time, rather than Ms. Giles's testimony that she was inside the house when Mr. Giles reentered.

¶ 52    Further, Ms. Giles, Ms. Hooks, and Mr. Burns were not present when, according to Ms. Muhammad, Mr. Giles pulled her out of bed by her leg, struck her in the guest room, and "tussle[d]" with her. This was testimony from which a rational factfinder could conclude that Mr. Giles made physical contact of an insulting or provoking nature with her. Mr. Giles even seemingly admitted to making some contact with Ms. Muhammad when telling her to "scoot back," which

both his counsel and the court suggested during closing argument included his pushing Ms. Muhammad. It is not necessary to know for certain how all Ms. Muhammad's scratches occurred to sustain Mr. Giles's conviction. See *Davidson*, 2023 IL 127538, ¶ 16 ("[I]t is the nature of the [insulting or provoking] contact, not the actual impact on the victim, that must be established."). Ultimately, viewing the evidence in the light most favorable to the State, the photographs of Ms. Muhammad's injuries corroborate her testimony that Mr. Giles made physical contact with her, and her description of that physical contact is sufficient to establish that a reasonable person under the circumstances would find the contact insulting or provoking.

¶ 53    We also reject Mr. Giles's arguments that Ms. Muhammad's testimony is rendered incredible by the evidence she had been drinking and by the State's failure to introduce into evidence records of the text messages or phone calls that instigated the initial confrontation with Mr. Giles. Ms. Muhammad testified she had one glass of wine—no witness testified they saw her consume more alcohol than that. The contents of Ms. Muhammad's phone might be probative as to whether Mr. Giles was motivated by jealousy or protection of his personal information. But that motivation is not relevant to his guilt and to the extent it impacts credibility, Ms. Muhammad admitted she might have given away his personal information.

¶ 54    Mr. Giles also argues that Ms. Muhammad's offer to go to the doctor when giving a statement to COPA if it "would help out this case in any way," undermines her credibility because it demonstrated "her desire to see [Mr.] Giles prosecuted, regardless of the underlying facts." Of course, the trial court heard this testimony and made its credibility decisions with this evidence before it. Moreover, Ms. Muhammad's desire to help the investigation could reasonably be because Mr. Giles, in fact, inflicted her injuries.

¶ 55    In sum, while the parties offered two different versions of the events in Ms. Muhammad's

house, the evidence the trial court relied on to convict Mr. Giles was neither so improbable nor so unreasonable that we should reverse Mr. Giles's conviction.

¶ 56                                B. Improper Impeachment

¶ 57    Mr. Giles next argues that his conviction should be reversed because Sergeant Welch's testimony that Ms. Giles, Ms. Hooks, and Mr. Burns each declined to give a statement to COPA was improperly admitted to impeach their credibility.

¶ 58    Illinois Rule of Evidence 613(b) (eff. Sep. 17, 2019) provides: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is first afforded an opportunity to explain or deny the same and the opposing party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." A prior inconsistent statement can be an omission, as well as an affirmative statement. *People v. Larry*, 218 Ill. App. 3d 658, 666 (1991).

¶ 59    Mr. Giles argues that the State failed to lay a proper foundation to admit Sergeant Welch's testimony in rebuttal as to Ms. Giles and Mr. Burns because they were not given an opportunity to explain or deny their decision not to provide a statement to COPA. As to Ms. Hooks, he argues that Sergeant Welch's testimony that Ms. Hooks did not provide a statement to COPA was cumulative, as she admitted as much in her testimony. Mr. Giles also asserts that evidence of their failure to give statements to COPA was irrelevant. We review alleged evidentiary errors for an abuse of discretion. *People v. Degrave*, 2023 IL App (1st) 192479, ¶ 53.

¶ 60    Mr. Giles acknowledges that this issue has not been properly preserved for our review, as he did not object to Sergeant Welch's testimony at trial or raise the issue in a posttrial motion. *People v. Galarza*, 2023 IL 127678, ¶ 45. However, he requests review under the plain error doctrine, which allows a reviewing court to reach an unpreserved error where (1) "the evidence is

so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) the "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *Id*. Mr. Giles, contending the evidence was closely balanced, argues for first-prong plain error. However, "[a]bsent reversible error, there can be no plain error." *People v. Naylor*, 229 Ill. 2d 584, 602 (2008). We need not determine whether the evidence was closely balanced in this case, since we find no reversible error in the admission of this testimony. *People v. Jackson*, 2020 IL 124112, ¶ 81 ("In addressing an assertion of plain error, it is appropriate to determine whether reversible error occurred at all.").

¶ 61    In a bench trial, an error in the admission of evidence is reversible only where there is a reasonable probability that the trial court would have acquitted the defendant had it excluded the erroneously admitted evidence. *People v. Smart*, 2025 IL 130127, ¶ 93. We must presume "that the trial court considered only admissible evidence and disregarded inadmissible evidence" unless "the record affirmatively shows the contrary." (Internal quotation marks omitted.) *Id.* ¶ 94. The record must support an inference that the trial court relied on the inadmissible evidence. *Id.* ¶ 100. In *Smart*, our supreme court found that the presumption was not rebutted where the erroneous admission of other misconduct was "not a material factor in the [trial] court's decision." *Id.* ¶ 106.

¶ 62    Here, there is no indication that Sergeant Welch's testimony factored into the trial court's decision to find Mr. Giles guilty of domestic battery. The court never said that it found Ms. Giles, Ms. Hooks, or Mr. Burns incredible witnesses because they declined to give statements to COPA. Mr. Giles's argument that this was considered is premised on (1) the State's claim in closing argument that it was hard to impeach the defense witnesses because they had refused to give a statement to COPA, (2) the court's statement, before finding Mr. Giles guilty, that "Police are

17

people, too. Just because they're cops, and they want—not to say something—anything at all. Happen to be police, happen to be police. That's all," and (3) the fact that the error was "repeated" as to multiple witnesses.

¶ 63    To the extent that Mr. Giles is suggesting that we should assume the trial court considered Sergeant Welch's testimony because it did not affirmatively state that it was *not* considering it, he is asking us to flip the required presumption on its head. See *id.* ¶ 94 (reviewing court must presume trial court disregarded inadmissible evidence unless the record affirmatively shows otherwise). We also cannot assume that the court considered that testimony simply because the State argued that it should. See *id.* ¶¶ 26, 104-106 (finding that inadmissible propensity evidence was not a material factor where the State relied on the inadmissible evidence in closing but the judge stated that only prior sexual misconduct would be relevant and did not refer to other evidence of misconduct when summarizing the trial evidence). The only statement from the court itself in this case is the opaque observation that police officers might not want to "say something." It is unclear what this means but it suggests that the court was placing little weight, if any, on the fact that some of the police officer witnesses declined to give a statement.

¶ 64    We recognize, as Mr. Giles argues, that there are extreme cases where the presumption that a trial court disregarded inadmissible evidence is overcome, despite no express statement by the trial judge. But the alleged error here, in the State failing to provide an opportunity for the defense witnesses to explain their decision not to give a statement to COPA, is nothing like the repeated, unsupported, negative insinuations the State made about the defendant and the defense witnesses in the case that Mr. Giles relies on, *People v. Nuccio*, 43 Ill. 2d 375, 394-96 (1969), which our supreme court found could have "seriously impeached" the credibility of the defendant and his witnesses such that "fundamental fairness" demanded that the defendant be afforded a new trial.

18

¶ 65    Mr. Giles also argues, citing *Naylor*, 229 Ill. 2d at 603, that the presumption that a court did not consider improper evidence is limited to presuming that, where a piece of evidence may have been admitted for both proper and improper purposes, the court only considered it for proper purposes. But both the *Naylor* court and the court more recently in *Smart* made clear that the presumption applies to evidence that is simply inadmissible. *Smart*, 2025 IL 130127, ¶¶ 94, 106; *Naylor*, 229 Ill. 2d at 603.

¶ 66    Accordingly, where the record provides no affirmative indication that the court considered this particular improper impeachment of the defense witnesses in finding Mr. Giles guilty, there is no reversible error. *Smart*, 2025 IL 130127, ¶¶ 94, 100. As there is no reversible error, there is no plain error (*Naylor*, 229 Ill. 2d at 602), and we need not consider Mr. Giles's argument that the evidence at trial was closely balanced.

¶ 67                                C. Right to a Fair Trial

¶ 68    Last, Mr. Giles claims that the trial court violated his right to a fair trial by prejudging his guilt before the trial had concluded.

¶ 69    Due process requires a defendant receive a fair and impartial trial before an unbiased, open-minded factfinder. *People v. Taylor*, 357 Ill. App. 3d 642, 647 (2005). This right is violated if the factfinder renders judgment before the close of trial. *Id.* A court must remain impartial throughout trial and not demonstrate bias against a party, a rule which applies through the end of closing arguments. *People v. Crawford*, 343 Ill. App. 3d 1050, 1059-61 (2003).

¶ 70    We presume that trial judges are impartial, and the party challenging a judge's impartiality must overcome that presumption. *People v. Romero*, 2018 IL App (1st) 143132, ¶ 96. "Allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place." (Internal quotation marks omitted.) *Id.* To

demonstrate bias, the defendant must identify remarks indicating "active personal animosity, hostility, ill will, or distrust toward the defendant." (Internal quotation marks omitted.) *Id.* Mere "displeasure or irritation with an attorney's behavior" does not necessarily mean that the judge is biased against the defendant or counsel. *Id.* ¶ 105. Improper comments are only reversible error if the defendant shows they were prejudicial and harmed him such that they were a material factor in the conviction (*People v. Lopez*, 2012 IL App (1st) 101395, ¶ 57) or show that the judge was biased (*People v. Jones*, 2017 IL App (1st) 143403, ¶ 32). In sum, a defendant is entitled to a fair trial, not a perfect trial. *Romero*, 2018 IL App (1st) 143132, ¶ 110. We review *de novo* whether a trial judge's conduct requires reversal. *Id.* ¶ 96.

¶ 71    The State argues that Mr. Giles has forfeited this claim by failing to object to any of the court's allegedly improper comments or raise the issue in a posttrial motion. However, the forfeiture rule must be relaxed where, as here, the basis for Mr. Giles's claim of error is the trial judge's own conduct. *Id.* ¶ 84; see *People v. Velazquez*, 2025 IL App (1st) 230449, ¶ 68 ("[J]udicial misconduct is a proper basis for relaxing the appellate rule that a defendant must both object at trial and include his objections in a posttrial motion."). Thus, we consider this argument on the merits.

¶ 72    Mr. Giles argues that the court made comments before and during trial that show it had prematurely concluded he was guilty. Specifically, during the hearing on Mr. Giles's motion to remove GPS monitoring as a condition of his bond, the court learned that Mr. Giles had a young child with a woman other than Ms. Muhammad. The court compared him to a basketball player that reportedly had 11 children with 11 different women. Mr. Giles claims these sarcastic remarks showed the court's disdain for and bias against him. However, while these specific comments reflected the trial judge's tendency during these proceedings to expound on the record and

occasionally veer into irrelevant matters, the record does not reveal that they played any role in the court's decision to find Mr. Giles guilty of domestic battery or indicate that the judge was biased against him or prejudged him guilty because of his personal life. They do not demonstrate animosity, hostility, ill will, or distrust toward Mr. Giles (*Romero*, 2018 IL App (1st) 143132, ¶ 96), or create doubt that he "received a fair trial by an impartial arbitrator" (*People v. Phuong*, 287 Ill. App. 3d 988, 994-95 (1997)).

¶ 73     Mr. Giles also cites the remarks the court made, during the same hearing, that there would be "no consequence whatsoever [for Mr. Giles] by being on bond and GPS taken off," and if Mr. Mr. Giles was not being paid and was unfit for duty, it was "by his own choosing, right?" Mr. Giles argues that these comments demonstrate that the court had assumed he committed the conduct with which he was charged.

¶ 74     However, those comments must be viewed in the context of the bond hearing. The court in such a hearing has the difficult task of presuming the defendant innocent, while simultaneously considering whether the alleged conduct that brought him before the court allows for pretrial release and on what conditions. During that hearing, the court asked what class of felony the aggravated domestic battery charge would be, "if established, I am not saying it will be or won't be." This comment reflects the court's understanding that no determination on guilt was to be made at this point. And, of course, the court ultimately found Mr. Giles not guilty of aggravated domestic battery. We also find it significant that the court granted Mr. Giles's request to remove the GPS monitor. These actions by the trial court militate strongly against Mr. Giles's argument that the trial court had predetermined his guilt as early as the bond hearing.

¶ 75     Mr. Giles also asserts that the trial court's "prejudgment *** culminated in the court's repeated interruptions of [his] closing argument." He notes that during his counsel's closing

argument, the court expressed disagreement with defense counsel's arguments that Ms. Muhammad could have been injured by breaking down the door because she did so with her foot and that it was odd she did not call the police sooner because she was a police officer herself. The court also asked, "What about beneath the left eye?" when counsel argued that he saw no injuries on a picture of Ms. Muhammad's face. Mr. Giles contends that these interruptions show that the court had determined that it would find him guilty of something, notwithstanding flaws in the State's evidence. Moreover, as Ms. Muhammad had not testified that she was struck in the eye, Mr. Giles argues the judge was acting as a prosecutor and seeking to find Mr. Giles guilty based on theories that the State had not even presented. He notes that, in contrast, the court barely interrupted the State's argument.

¶ 76    Although the court challenged some of defense counsel's arguments, none of the court's remarks, taken alone or cumulatively, are the sort of "excessive and exaggerated derogatory comments" that we have found indicate a court "had already decided the case and was not interested in any argument from the defense." See *People v. Heiman*, 286 Ill. App. 3d 102, 112 (1996). While Mr. Giles compares his case to *Heiman*, the trial court there interrupted the defense attorney 45 times during his closing argument, said during argument that it believed the defense's expert witness exaggerated in his testimony because he was defense counsel's father; that defense counsel made a mistake by calling his father as an expert witness; and that an occurrence witness called by the defense was lying, a "little sneak," and a "piece of garbage." See *id.* at 109-11. This was in addition to previous comments disparaging the credibility of those witnesses. *Id.* at 112.

¶ 77    While the court in this case expressed disagreement at times with defense counsel's summary of certain testimony, unlike in *Heiman*, it did not indicate that it had made a determination about the witnesses' credibility until it made its findings. The court's tendency

22

throughout the proceedings to make digressions and asides does not overcome the presumption that it was impartial. Nor do we believe that the court's remarks, considered together, had the cumulative effect of denying Mr. Giles a fair trial. Moreover, the court acquitted Mr. Giles of the more serious charge, reflecting a willingness to parse the evidence before it and hold the State to its burden of proof.

¶ 78                                    IV. CONCLUSION

¶ 79    The State proved Mr. Giles's guilt beyond a reasonable doubt, the court did not commit reversible error by allowing Sergeant Welch's testimony, and the court did not deny Mr. Giles a fair trial by showing bias against him or prejudging him guilty of the charged offenses. Thus, we affirm Mr. Giles's conviction.

¶ 80    Affirmed.


¶ 81    JUSTICE ODEN JOHNSON, specially concurring:

¶ 82    I agree with the majority's legal analysis and ultimate conclusion, but I write separately to emphasize that when a judge, who in this case was the trier of fact, makes repeated digressions, asides, or sarcastic comments about matters that are not elements of the offense they can give the appearance of bias and prejudgment. While, in the case at bar, the judge's disparaging comments regarding defendant's paternity of another child, and the interruptions during defense counsel's closing argument may not rise to the level of requiring reversal as in *People v. Heiman*, 286 Ill. App. 3d 102, 112 (1996), such comments and tendencies can be a slippery slope toward the appearance of prejudgment and bias which ultimately leads to the erosion of trust, not only in that particular judge, but in the judiciary as a whole.